UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:23-CR-0056-B |
| | § | |
| JUAN ESTEBAN ZELAYA | § | |
| HERNANDEZ, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Juan Esteban Zelaya Hernandez's Motion to Dismiss Count One of the Indictment (Doc. 20). Zelaya Hernandez moves to dismiss the first count—possession of a firearm by a convicted felon—on the grounds that the underlying statute is unconstitutional under the Second Amendment and the Commerce Clause. Because the Court finds the statute constitutional on both challenges, the Court **DENIES** Zelaya Hernandez's Motion.

## I.

## BACKGROUND

In 2018, Zelaya Hernandez was convicted of Attempted Arson of a Structure, a third-degree felony, in Osceola County, Florida. Doc. 1, Compl., ¶ 5. After serving his sentence, Zelaya Hernandez was removed to Honduras. *See id.* ¶¶ 4–5; Doc. 12, Indictment, 2. But Zelaya Hernandez subsequently reentered the United States,[1] where he was later indicted by a grand jury for possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1) and illegal

---

[1] For purposes of the Motion, the Court takes the facts as alleged in the indictment as true.

reentry under 8 U.S.C. § 1326(a). *See* Doc. 12, Indictment, 1–2. Zelaya Hernandez now moves to dismiss count one, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional on its face because it violates the Second Amendment and exceeds Congress's power under the Commerce Clause. *See generally* Doc. 20, Mot. Dismiss. Section 922(g)(1) makes it "unlawful for any person . . . who has been convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition."[2]

## II.

## ANALYSIS

A.    *Second Amendment Challenge*

Though the Fifth Circuit has previously held that § 922(g)(1) is constitutional, Zelaya Hernandez argues that the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) changes that result. Specifically, Zelaya Hernandez contends that the government cannot meet its burden of showing § 922(g)(1) is consistent with the Nation's history and tradition of firearm regulation, as required under *Bruen*. Doc. 20, Mot. Dismiss, 9. In response, the government raises three arguments. First, the government contends Zelaya Hernandez's Second Amendment argument is foreclosed by precedent. Doc. 21, Resp., 2–5. Second, the government asserts that "felons" are not among "the people" protected by the Second Amendment. *Id.* at 6–7. And finally, the government argues the felon-in-possession ban is consistent with history and tradition. *Id.* at 7–15. The Court begins by

---

[2] For simplicity, the Court will refer to this statute as banning "felons" from firearm possession. *See* 18 U.S.C. § 3559. However, the statute also covers individuals convicted of a state misdemeanor punishable by more than two years in prison and excludes offenses relating to the regulation of business practices. *See* 18 U.S.C. § 921(20).

laying out the present landscape of Second Amendment jurisprudence under *Bruen*. The Court then turns to § 922(g)(1) and considers the statute's constitutionality.

    1.    <u>*Bruen* and Second Amendment Jurisprudence</u>

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  Prior to *Bruen*, in *District of Columbia v. Heller* and *McDonald v. Chicago*, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *See Bruen*, 142 S. Ct. at 2125 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)). After *Heller* and *McDonald*, the lower courts largely "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Id.* The Supreme Court in *Bruen*, however, rejected that approach and clarified the framework for applying the Second Amendment. *Id.* at 2126. The Supreme Court held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* To justify regulation of such conduct, the Government must then show "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

The test, rooted in constitutional text and history, aims to understand the original meaning of the amendment, "fixed according to the understandings of those who ratified it," while also applying that understanding to address modern-day circumstances. *See id.* at 2132. Accordingly, the Supreme Court directs courts to engage in analogical reasoning in determining the permissibility of modern statutes and regulations. *See id.* ("Fortunately, the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and

consequently, to be adapted to the various crises of human affairs.'") (citing *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819)).

Such analogical reasoning requires courts to ask if the regulations are "relevantly similar," which, the Supreme Court suggests, "point[s] toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. When engaging in these comparisons, a challenged regulation need not be "a dead ringer for historical precursors . . . to pass constitutional muster." *Id.* at 2133. Only a "historical analogue" is required, not a "historical twin." *Id.* (emphasis omitted).

2.    Prior Fifth Circuit Precedent

The government first argues that Zelaya Hernandez's argument is foreclosed by Fifth Circuit precedent. Indeed, the Fifth Circuit held, pre-*Bruen*, that 18 U.S.C. § 922(g)(1) does not violate the Second Amendment. *See, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017). Moreover, the Fifth Circuit's reasoning in prior cases relied largely upon the text and history of the Second Amendment. For example, the Fifth Circuit in *United States v. Darrington* held that the individual right recognized by the Second Amendment "does not preclude the government from prohibiting the possession of firearms by felons." 351 F.3d 632, 633 (5th Cir. 2003). It went on to note that a prior Fifth Circuit case, *United States v. Emerson*, "discusses authority that legislative prohibitions on the ownership of firearms by felons are not considered infringement on the historically understood right to bear arms protected by the Second Amendment." *Id.* at 634 (citing *United States v. Emerson*, 270 F.3d 203, 261, 226 n.21 (5th Cir. 2001)).

In *Rahimi v. United States*, however, the Fifth Circuit considered a post-*Bruen* challenge to a similar provision, 18 U.S.C. § 922(g)(8), which prohibited persons subject to a domestic

violence restraining order from possessing firearms. 61 F.4th 443 (5th Cir. 2023). There, too, the Fifth Circuit had prior precedents upholding § 922(g)(8). *See id.* at 450. But the Fifth Circuit held that *"Bruen* clearly fundamentally changed our analysis of *laws that implicate the Second Amendment*, rendering our prior precedent *obsolete*." 61 F.4th at 450 (internal alteration and citation omitted) (emphasis added) (citing *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). Under that directive, the Fifth Circuit left little room for precedent relating to 18 U.S.C. § 922(g)(1) to nonetheless survive. *See also United States v. Barber*, 2023 WL 1073667, at *4 (E.D. Tex. Jan. 27, 2023) (applying *Bruen* as opposed to the Fifth Circuit's pre-*Bruen* precedent to a motion challenging § 922(g)(1) and noting the "district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority").

Similarly, though the Fifth Circuit previously drew conclusions regarding the "historically understood right to bear arms," both *Bruen* and *Rahimi* provide examples of the historical analysis required for a statute to pass constitutional muster. The Fifth Circuit's prior precedents do not meet this standard. For example, no primary sources are cited in *Emerson*. And the secondary sources cited lack direct or persuasive primary sources regarding the disarming of felons. *See, e.g.*, Stephen B. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms,"* 49 Law & Contemp. Probs. 151, 161 (1986) (stating, without citation, that "violent criminals . . . may be deprived of firearms"); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) (citing only secondary sources relating to the ratifying convention proposals). The Court thus considers Zelaya Hernandez's challenge under the framework set out by *Bruen*.

3.      "The People" Protected by the Second Amendment

Under *Bruen*, the Court first asks whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. For 18 U.S.C. § 922(g)(1), the key question at this step is whether the Second Amendment's reference to "the people" includes felons. *Compare, e.g.*, *United States v. Hill*, 2022 WL 17069855, at *4–5 (S.D. Tex. Nov. 17, 2022) (concluding felons do not fall within "the people" protected by the Second Amendment), *with United States v. Coombes*, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (concluding, based on other constitutional references to "the people," that the Second Amendment applies to felons). The Court ultimately finds that although *Rahimi* provides a potential basis for excluding "felons" from "the people," case law and practical anomalies counsel against such a conclusion.

*Rahimi* seems to at least leave open the possibility that felons are outside of "the people" protected by the Second Amendment. There, the Fifth Circuit surmised that "[l]aws that disarmed slaves, Native Americans, and disloyal people may have well been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state." *Rahimi*, 61 F.4th at 457. But *Rahimi* also explicitly endorses an approach to the Second Amendment that primarily focuses on the government's power to take the Second Amendment right away, not the right's initial scope. *See id.* at 452. Specifically, in wrestling with *Heller* and *Bruen*'s reference to "law-abiding, responsible citizens," the Fifth Circuit noted the different analytical approaches to the Second Amendment:

> "[O]ne approach uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one.

*Id.* at 452–52 (internal alteration omitted) (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111).

Indeed, as the Supreme Court has made clear, "the Second Amendment confer[s] an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. And "the people," as with "all six other provisions of the Constitution that mention 'the people,'" has been read to "refer[] to all members of the political community, not an unspecified subset." *Id.* at 580; *see also id.* at 581 (noting, in interpreting the interaction between the Second Amendment's operative and prefatory clause, that the term "the people" created a "strong presumption that the Second Amendment right . . . belongs to *all Americans*") (emphasis added).

This approach also avoids a somewhat anomalous conception of individual rights. Typically, a deprivation of rights "occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Kanter*, 919 F.3d at 452–53 (Barrett, J. dissenting). The converse approach would strip the right "as a self-executing consequence of [a person's] new status," regardless of any legislative determination regarding the appropriate deprivation. *See id.* at 452. More concretely, suppose that Congress had decided to disarm non-violent felons for ten years following conviction. In twenty years, a non-violent felon would be beyond the period Congress designated to disarm him. But if authorities nonetheless tried to disarm him, he would be without constitutional standing to assert a Second Amendment claim because his felon status automatically removed him from the Second Amendment's scope. *See id.*; *United States v. Goins*, 2022 WL 17836677, at *7 (E.D. Ky. Dec. 21, 2022). "That is an unusual way of thinking about rights." *See Kanter*, 919 F.3d at 452 (Barrett, J., dissenting); *accord Rahimi*, 61 F.4th at 453.

Thus, although the term "the people" may have some textual bite, the Court is hesitant based on current case law and other practical anomalies to definitively conclude felons are outside of the scope of the Second Amendment by way of the term "the people." And beyond the threshold question of who constitutes "the people," 18 U.S.C. § 922(g)(1) plainly implicates the Second Amendment, as it flatly prohibits the possession of any firearm. *See Bruen*, 142 S. Ct. at 2134. Accordingly, the Second Amendment's plain text covers the conduct, and the Constitution presumptively protects that conduct unless § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *See id.* at 2126.

4.    Historical Analogues

The Court thus turns to the historical tradition of firearm regulation. The Court looks to history because the Second Amendment is widely understood as having "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. Here, as evidence that the original "right" did not preclude disarming felons, the government relies on two types of historical sources. First, the government cites laws authorizing capital punishment and estate forfeiture of felons. Doc. 21, Resp., 7–11. It then highlights "[l]aws disarming untrustworthy individuals and those outside the political community." *Id.* at 11–13.

In searching the historical record, the most obvious starting point is historical analogues pertaining directly to "felons" or criminals as a class. Within this category, the government first points to the historically harsh laws that punished felons with capital punishment and estate forfeiture. *Id.* at 7. Because of the harsh punishments imposed on felons, the government argues, the public could not have understood felons to nonetheless retain their right to possess arms. *See id.* at 10 (citing *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)). Put differently, because felons were already stripped of their rights, "explicit provisions depriving them of firearms would

-8-

have been redundant." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). And, of course, in determining the original meaning, the Court must keep in mind that "a list of the laws that happened to exist in the founding era" is not coextensive with laws the ratifiers would have found permissible. *See United States v. Kelly*, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). The problem, however, is that the label of "felon" as a reliable indicator of a permanent deprivation of rights during the founding era is "shaky." *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

To be sure, at common law, a felony was "was intertwined with the punishments of death and civil death." *Id.* (citing 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769)). "Civil death" referred to "a state in which a person, 'though living, was considered dead'—a status 'very similar to natural death in that all civil rights were extinguished.'" *Id.* (quoting Harry David Saunders, Note, *Civil Death—A New Look at an Ancient Doctrine*, 11 Wm. & Mary L. Rev. 988, 988–89 (1970)). But during the period of the founding, the direct connection between a "felony" and the permanent deprivation of rights "started to fray." *See id*; *see also Medina*, 913 F.3d at 158 (quoting Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468, 473 (2009)) (noting that "the penalties for many felony crimes quickly became less severe in the decades following American independence and, by 1820, forfeiture had 'virtually disappeared in the United States.'"). As James Madison observed, "felony" was "a term of loose signification, even in the common law of England" and was "not precisely the same in any two of the States." The Federalist No. 42, at 262 (James Madison) (Clinton Rossiter ed., 2003). As such, during the founding era, "the definition of 'felony' was difficult to pin down," and "a felony conviction and the loss of all rights did not necessarily go hand-in-hand." *Kanter*, 919 F.3d at 459, 461 (Barrett, J., dissenting).

Similarly, to the extent the government's argument relies on the harshness of the legal penalties for some felonies, those historical analogues run into another conceptual problem. Then-Judge Barrett alludes to this in her dissent in *Kanter*. On capital punishment, she writes,

> [W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.

*Id.* at 461–62. Even more broadly, the value of historical analogues that draw on the harshness of felony penalties *per se* is limited: 18 U.S.C. § 922(g)(1) relies upon a prior conviction and one's *status* as a felon to deprive his right to possess weapons after *returning to society*. That a felon could not possess a weapon while being punished, therefore, is of questionable relevance. *See Bruen*, 142 S. Ct. at 2132.

Without a historical "dead ringer" to "felons" as a class, the next step is to look for other relevantly similar historical analogues. *See id.* at 2133. As *Bruen* made clear, understanding the original meaning does not require a "historical twin." *Id.* (emphasis omitted). In this category, the government points to laws which "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." Doc. 21, Resp., 11 (quoting *Range v. Att'y Gen. United States*, 53 F.4th 262, 274 (3d Cir. 2022), *rev'd en banc*, 69 F.4th 96 (3d Cir. 2023)).

That characterization may sweep too broadly. But the historical record does provide evidence of disarming persons that were viewed as dangerous or a threat to public safety. As early as 1328, the Statute of Northampton provided that

> Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in

> the presence of the Justices or other Ministers, nor in no part elsewhere, *upon pain to forfeit their Armour to the King*, and their Bodies to Prison at the King's pleasure."

*Bruen*, 142 S. Ct. at 2139 (emphasis added) (quoting 2 Edw. 3 c. 3 (1328)). And although the Statute of Northampton itself provides limited context in interpreting the Second Amendment, *see id.* at 2139, the prohibition against going armed to "terrify the People" survived in the decades leading to the founding, *see id.* at 2142.[3]

As summarized by Chief Justice Herbert in 1686, the "act of 'go[ing] armed to terrify the King's subjects' was 'a great offence at the common law' and . . . the Statute of Northampton 'is but an affirmance of that law.'" *Id.* at 2141 (alterations in original) (emphasis omitted) (quoting 3 Mod., at 118, 87 Eng. Rep., at 76). And a widely read treatise by Serjeant William Hawkins in 1716 suggested the Statute of Northampton would still be implicated when "accompanied with such Circumstances as are apt to terrify the People." *See id.* at 2142 (citing 1 Pleas of the Crown 136). As Hawkins further noted, "Persons of Quality" did not risk violating the statute because they had no "Intention to commit any Act of Violence or Disturbance of the Peace." *Id.* (citing 1 Pleas of the Crown 136). The Statute of Northampton, as then understood, thus "survived . . . the English Bill of Rights" in 1689, which is regarded as the "predecessor to our Second Amendment." *Id.* at 2141–42.

Similarly, the 1689 English Bill of Rights guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* (alteration in original)

---

[3] The Fifth Circuit in *Rahimi* questioned the reliability of "going armed" laws as indicators of the "Nation's historical tradition." *See* 61 F.4th at 458–59. However, the court in *Rahimi* relied on different historical sources in support, and it also underscored other procedural differences that made the cited "going armed" laws less relevantly similar to 18 U.S.C. § 922(g)(8), the provision in question in that case. *See id.* In other words, the Court does not read *Rahimi* as entirely closing the door on "going armed" laws as helpful historical analogues.

(citing 1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689)). But the same Parliament that passed the English Bill of Rights also passed a law that disarmed Catholics who refused to renounce their faith and were thus seen as threatening. *See* Doc. 21, Resp., 11; *see also Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). Catholics, as then-Judge Barrett explained, were "presumptively thought to pose a . . . threat or terror." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citing Joyce Lee Malcolm, *To Keep and Bear Arms* 18–19, 122 (1994)).

And "[s]imilar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place." *Id.* In addition to the continued disarmament of Catholics who refused to swear an oath of allegiance, slaves and Native Americans were also disarmed "as a matter of course." *Id.* at 458 (citing Malcolm, *supra*, at 140–41); *accord United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quoting Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562 (2009)) ("[S]everal colonies enacted 'complete bans on gun ownership' by slaves and Native Americans.").

From these historical laws, a few conclusions may be drawn. First, history supports the idea that the original understanding of the right codified by the Second Amendment permitted some categorical limits on the right to bear arms. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)). And one of those categorical limits seems to be the disarmament of persons deemed dangerous or a threat to public safety. *See, e.g., id.* ("The historical evidence does . . . support . . . that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety."); *Goins*, 2022 WL 17836677, at *10 ("[H]istory supports disarming individuals who . . . have committed crimes that indicate they are a danger to public safety."). Together, "Congress is not limited to case-by-case exclusions of persons who

have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Kanter*, 919 F.3d at 464 (Barrett J., dissenting) (quoting *Skoien*, 614 F.3d at 641). The question for this Court then becomes whether 18 U.S.C. § 922(g)(1)'s focus on one's status as a convicted felon is an appropriate classification for those deemed a "threat to public safety." The Court concludes that it is.

All classifications are, by nature, both underinclusive and overinclusive to their stated purpose, and concluding whether modern-day laws are sufficiently analogous to their historical counterparts will inevitably require line drawing. *See Bruen*, 142 S. Ct. at 2134 ("[A]pplying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins."). The Court cannot, however, in light of the historical record and the historical clues as to the original meaning, conclude that Congress's decision to use a person's felony status as a proxy for dangerousness or a threat to public safety is insufficiently analogous to deem it facially unconstitutional under the Second Amendment. As the Fifth Circuit recognized, "somewhat abstracting the laws' justifications" seems "consistent with *Bruen*'s instruction" in identifying historical analogues. *Rahimi*, 61 F.4th at 460 n.10.

Felonies remain the most serious category of crime and reflect a "grave misjudgment and maladjustment." *See Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). And a facial challenge "considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Rahimi*, 61 F.4th at 453. That a statute may "operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Rahimi*, 61 F.4th at 453 (citing *Salerno*, 481 U.S. at 745).

Thus, the Court finds that banning firearm possession for convicted felons—a class of persons who have been criminally convicted of serious crimes and generally shown a serious disregard for the law and rights of others—passes constitutional muster. Namely, the law is sufficiently analogous to the historical understanding that dangerous persons or threats to public safety could be stripped of their Second Amendment right. To be sure, the classification—like all classifications—may be overinclusive or underinclusive at the margins. But facially, the Court finds the law historically consistent with the "right" enshrined by the Second Amendment. The Court is not alone in this conclusion. *See, e.g.*, *Barber*, 2023 WL 1073667, at *11 (rejecting facial challenge on the grounds that § 922(g)(1) was "'relevantly similar' to historical regulations limiting the possession of arms by dangerous persons"); *Campiti v. Garland*, 2023 WL 143173, at *4 (D. Conn. Jan. 10, 2023) ("[W]hile no 18th- or 19th-century laws specifically banned felons from possessing firearms, the defendants have shown that there exists a relevant historical analogue—prohibitions on firearm possession by individuals whom the state deems dangerous . . . . ").

Zelaya Hernandez himself is a case in point. He was previously convicted of Attempted Arson of a Structure, a third-degree felony. Doc. 1, Compl., ¶ 5. As a convicted felon, Zelaya Hernandez was prohibited from possessing a firearm. *See* § 922(g)(1). But, after illegally reentering the United States, he was apprehended with a handgun. *See* Doc. 12, Indictment. As demonstrated, § 922(g)(1)'s prohibition is facially consistent with founding-era efforts to disarm dangerous people and threats to public safety. Accordingly, the Court **DENIES** Zelaya Hernandez's Motion to Dismiss Count One of the Indictment on Second Amendment grounds.

B.    *Commerce Clause Challenge*

Zelaya Hernandez's argument regarding the permissibility of 18 U.S.C. § 922(g)(1) under the Commerce Clause is entirely foreclosed by precedent. *See, e.g.*, *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013); *United States v. Nichols*, 2022 WL 5401942, at *1 (5th Cir. Oct. 6, 2022) (per curiam), *cert. denied*, 143 S. Ct. 827 (2023). Accordingly, the Court **DENIES** Zelaya Hernandez's Motion to Dismiss Count One of the Indictment on Commerce Clause grounds.

### III.

### CONCLUSION

Because the Court finds that 18 U.S.C. § 922(g)(1) is constitutional under both the Second Amendment and the Commerce Clause, the Court **DENIES** Zelaya Hernandez's Motion to Dismiss Count One of the Indictment (Doc. 20).

**SO ORDERED.**

**SIGNED: June 23, 2023.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE